**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

-----------------------------------------------------------x

**PAULA LEATHERS,**

                         **Plaintiff,**

                **v.**

**ABBOTT LABORATORIES, and**
**KNOLL PHARMACEUTICAL**
**COMPANY**

                    **Defendants.**

-----------------------------------------------------------x

**Civ. No.  05-10297 REK**

**AMENDED COMPLAINT**
**WITH JURY DEMAND**

NOW COMES the Plaintiff, PAULA LEATHERS, by and through her undersigned counsel, and complains of the defendants, ABBOTT LABORATORIES, and KNOLL PHARMACEUTICAL COMPANY, and alleges as follows:

## BACKGROUND

1.      Plaintiff brings this action to recover damages for personal injuries, restitution, refunds, medical monitoring and/or for equitable, injunctive, and declaratory relief against defendant which tested, marketed, distributed, promoted, and sold the diet drug, Meridia.

2.      Meridia has, thus far, been linked to over 34 deaths, including 29 in the United States, and hundreds of cases of serious adverse reactions worldwide.  It is believed that far more instances of serious side effects and death caused by, or associated with, taking Meridia have occurred but have not yet been properly diagnosed or reported to the appropriate governmental agencies because Abbott Laboratories ("Abbott") failed to put the medical community on notice of the strong association between the use of Meridia and cardiac complications.

## THE PARTIES

3.      The Plaintiff, PAULA LEATHERS, is a natural person residing at 72 Mt. Dustin

Avenue, Haverhill, Essex County, Massachusetts. Plaintiff was prescribed, purchased and ingested 10 mg of Meridia every day from March 4, 1998 through April 6, 1998, and 15 mg of Meridia from April 6, 1998, through August 28, 1998. By August 28, 1998, Plaintiff was suffering from a condition described as "fluctuating hypertension," which caused her blurred vision in the left eye and headache. Plaintiff was diagnosed as having had central retinal vein occlusion of her left eye, which resulted in the permanent loss of vision in her left eye. This condition was a proximately caused by her ingestion of Meridia.

4.    Defendant, ABBOTT LABORATORIES ("ABBOTT"), is an Illinois Corporation with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064-6400. Abbott Laboratories manufactures, markets, and distributes Meridia in over 70 countries throughout the world.

5.    Defendant, KNOLL PHARMACEUTICAL COMPANY ("KNOLL"), is a New Jersey Corporation with its principal place of business at 3000 Continental Drive North, Mount Oliver, New Jersey 07828. Knoll Pharmaceutical Company is the United States pharmaceutical unit of BASF Corporation and part of BASF Pharma, the global pharmaceutical business of BASF AG. Knoll Pharmaceutical Company develops and markets prescription drugs for obesity and other metabolic disorders, including Meridia, worldwide. Researchers in BASF's Pharmaceuticals Division in Great Britain and the United States developed sibutramine, the active ingredient in Meridia.

6.    On March 2, 2001, Abbott Laboratories acquired BASF AG's pharmaceutical divisions, including Knoll Pharmaceutical Company.

7.    At all relevant times since March 2, 2001, to the present, Abbott Laboratories and Knoll Pharmaceuticals Company shared many of the same officers and directors. Meridia was manufactured, marketed, and distributed in the United States by Abbott Laboratories and Knoll

2

Pharmaceuticals Company.

8.      At all relevant times, there existed and exists, a unity of interest in ownership between Abbott Laboratories and Knoll Pharmaceuticals Company such that any individuality and separateness between them has ceased and these defendants are the alter-egos of one another and exerted control over each other.  At all times relevant, they shared officers and directors and made all decisions in a uniform voice.  Adherence to the fiction of the separate existence of these certain defendants as entities distinct from one another will permit an abuse of the corporate privilege, and would sanction fraud and promote injustice.

9.      At all relevant times alleged in this matter, each defendant acted as the agent of the other defendants, within the course and scope of the agency, regarding the acts and omissions alleged.

10.      At all relevant times, defendant, itself, or by use of others did research, develop, manufacture, create, design, test, label, sterilize, package, distribute, supply, market, sell, promote, advertise, warn, and otherwise distribute Meridia in interstate and international commerce.

**JURISDICTION AND VENUE**

11.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000 exclusive of interest and costs, and because this is an action by a Plaintiff who is a citizen of a different state from the defendants.

**FACTUAL BACKGROUND**

12.      Meridia, also known as Sibutramine Hydrocholride Monohydrate, is a medication commonly prescribed to patients to aid in the treatment of obesity, including weight loss and

3

maintenance of weight loss.  Meridia works by affecting appetite control centers in the brain.  Meridia is a controlled substance in Schedule IV of the Controlled Substances Act.

13.     Meridia has been strongly associated with substantial increases in blood pressure and heart rate, and arrhythmia.  Studies have shown that Sibutramine has amphetamine-like effects and therefore was designated as a Schedule IV Controlled Substance.

14.     Meridia's other amphetamine-like effects include nervousness, hyperactivity, increased energy, anxiety, increased insomnia, asthenia, tremor, dry mouth, and a "speedy" feeling.  Other possible side effects included seizure, gallstone formation, headache, backache, flu-syndrome, abdominal pain, chest pain, neck pain, dry mouth, anorexia, insomnia, and constipation.

15.     Since its launch in early 1998, Meridia has been associated with 29 deaths in the United States, including 19 from cardiovascular adverse effects.  In addition, there have been 397 serious adverse reactions reported to the FDA since sibutramine was first marketed in February, 1998, up through the end of September, 2001.  Of these 397 serious adverse reactions, 152 patients were hospitalized and 29 patients died, including 19 with cardiovascular causes of death such as heart attacks.  There were also 143 patients in whom an arrhythmia was reported.

16.     On July 26, 1996, FDA officials met with representatives of Knoll to discuss concerns regarding the approval of Meridia by the FDA.  When questioned about increases in patient blood pressure, Knoll admitted that Meridia caused an increase in both systolic and diastolic blood pressure.  This increase was found in both patients with hypertension and in patients with blood pressure in the "normal range."  Moreover, the studies showed that Meridia caused increased blood pressure whether or not the patient was taking anti-hypertensive medication.

4

17.     The FDA then requested that Knoll explain why there were differences in the information presented to the FDA at that meeting when compared to the information contained in a July 15, 1996 document that Knoll previously presented to the FDA. The July document showed that there was a 23% placebo group in obese studies, while the current slide presentation showed only a 12.7% placebo group. Knoll responded by suspecting that maybe the discrepancy was caused by a change in the population. They advised the FDA that they would investigate the discrepancy and provide an explanation at a later date.

18.     The FDA informed Knoll they were concerned that there was insufficient information explaining  Meridia's effects on systolic blood pressure compared to diastolic blood pressure.  Knoll agreed to undertake further research into this concern.

19.     The FDA officials expressed further concern over Meridia's link to blood pressure and cholesterol problems, as opposed to being independent risk factors, as Knoll previously suggested. Knoll responded by stating that "some hypertension findings [in their data] are significant and some aren't." The FDA was having a hard time coming to a conclusion regarding the risks and benefits of Meridia based on the models Knoll presented. In fact, the FDA informed Knoll that so much of the data provided by Knoll was conflicting and that it made it difficult to understand the effects of Meridia. As far as FDA officials were concerned, the alleged "favorable trends" that Knoll mentioned were not consistent findings.

20.     The FDA ordered Knoll to perform more analysis on blood pressure and lipid changes caused by Meridia's negative side-effects.

*OCTOBER 11, 1996 MEMORANDUM BY FDA MEDICAL REVIEWER, ERIC COLEMAN, MD.*

21.     On October 11, 1996, Eric Coleman, M.D., FDA Medical Reviewer prepared a memorandum discussing the approval of Meridia. In his memorandum, Dr. Coleman

5

recommended "nonapproval of [Meridia] for the long-term treatment of obesity." His decision was based on studies indicating a cause and effect relationship between Meridia and elevation of blood pressure.

22.     Dr. Coleman stated that the data in Meridia's New Drug Application ("NDA") did not support Knoll's claim that the risks associated with Meridia's "pressor effect would be offset by improvements in lipoprotein lipid levels." Dr. Coleman reiterated that his "primary concern" is Meridia's effect on blood pressure.

23.     In addition, Dr. Coleman expressed concerns about another study, BRI 855 which yielded surprising results. In this study, patients' blood pressure was monitored for 24 hours at a time.  Researchers expected blood pressure to go down while patients slept.  However, they were surprised to find out that patients who took Meridia actually had an increase in blood pressure while they slept. Dr. Coleman believed that the results of the study were so important that they merited further review.

24.     Dr. Coleman concluded his memo by saying that extended use of Meridia "may likely subject a significant portion of relatively healthy, overweight individuals to substantial risk for cardiovascular events." Therefore, he recommended that phase 3 studies be conducted to better understand Meridia's effect on blood pressure. His conclusions were based on a complete medical review of Sibutramine Hydrochloride, and the results of studies submitted along with the NDA.

*OCTOBER 11, 1996 MEMORANDUM BY*
*FDA DEPUTY DIVISION DIRECTOR, GLORIA TROENDLE*

25.     In her October 11, 1996 memorandum, Gloria Troendle, Deputy Division Director of the FDA, stated that she believed that Meridia's benefits do not outweigh its risks. She said that it is unlikely that an acceptable patient screening method can be developed.

Therefore, she recommended that Meridia not be approved for weight control.

*OCTOBER 21, 1996 MEETING*

26.     On October 21, 1996 another meeting was held between FDA officials and representatives from Knoll.  At this meeting, the FDA advised Knoll that, on their own initiative, the Advisory Committee was presented with a copy of study 1047 because Knoll had not done so themselves.  FDA officials believed it was important that the Committee review the study because study 1047 contradicted the NDA which stated that there are no clinically significant problems with blood pressure.  The FDA also advised Knoll that their proposed blood pressure screens should have been presented to the Advisory Committee.

27.     At this meeting, the FDA officials acknowledged that Knoll had withdrawn its application for approval of a 30 mg dose of Meridia and suggested that Knoll consider withdrawing the 20 mg dose application.

28.     While discussing the findings of several studies on Meridia, the FDA stated that it felt as if both FDA and Knoll were analyzing the same data, but coming up with different conclusions.  Therefore, the FDA stated that it had a "need for validation of analysis and adequate review time." Knoll acknowledged that "further analysis may dictate the labeling such as black box warning."

*NOVEMBER 1, 1996 MEMORANDUM BY FDA DIRECTOR OF THE DIVISION OF METABOLIC AND ENDOCRINE DRUG PRODUCTS, SOLOMON SOBEL, M.D.*

29.     In his November1, 1996 memorandum, Solomon Sobel, M.D., Director of the FDA's Division of Metabolic and Endocrine Drug Products, said that he recommended Meridia receive an "approvable" letter, rather than "full approval." He said that the FDA still had some things it wanted to explore before full approval is granted.

30.     One of the issues the FDA wanted to explore was its main concern, Meridia's effect on blood pressure. The basis for this concern was the fact that there was evidence that Meridia caused a raise in systolic and diastolic blood pressure, as well as pulse rate.  Dr. Sobel further stated that there was a "significantly greater number" of patients taking Meridia that had large rises in blood pressure than the patients taking a placebo.  These blood pressure changes are considered a "safety risk," which caused the Committee to voted against approving Meridia.

31.     Dr. Sobel concluded by saying that some reviewers thought the 15 mg dose would be safer than the 20 mg dose.

*NOVEMBER 8, 1996 "APPROVABLE" LETTER FROM THE FDA*

32.     On November 8, 1996, James Blistad, M.D., Director of the FDA Office of Drug Evaluation II, Center for Drug Evaluation and Research sent correspondence to Knoll advising them that the 50 submissions received between August 9, 1995 and October 25, 1996 had been reviewed and that the NDA "may be approved" after submissions of additional information for further review, including the following:

a.     Further analyses of blood pressure data from clinical trials to provide appropriate labeling of the drug product for monitoring blood pressure ; and

b.     Submit results of preclinical studies in addition to ongoing preclinical [primate self-administered] and clinical studies to complete the abuse liability assessment.

*MARCH 25, 1997 MEMORANDUM BY FDA MEDICAL OFFICER*
*FOR METABOLIC-ENDOCRINE GROUP 2, BRUCE STADEL, M.D.*

33.     In his March 25, 1997 memorandum to Dr. Eric Coleman, Medical Officer for Metabolic-Endocrine Group 2, Dr. Stadel stated his opinion about two studies: BPI 852 and SB

1047.  He explained that both studies show that Meridia increased systolic and diastolic blood pressure.  He further stated that those findings were "significant statistically."

34.     Dr. Stadel recommended that if Meridia was approved, that it only be approved in doses less than 20 mg per day.  In addition, he recommended that Meridia's label should contain warnings of increased blood pressure.  Dr. Stadel further provided examples of warnings he believed to be appropriate.

*MAY 21, 1997 MEETING*

35.     At the May 21, 1997 meeting between FDA officials and Knoll, the FDA advised Knoll that clinical abuse studies showed that Meridia caused a "considerable" increase in blood pressure and heart rate.  The FDA compared the side-effects of Meridia to the kind of side-effects caused by d-amphetamine.

*SEPTEMBER 10, 1997 MEETING*

36.     At the May 21, 1997 meeting between FDA officials and Knoll, Dr. Coleman informed Knoll that it was the FDA's recommendation that Knoll withdraw the application for approval of the 20 mg dose of Meridia because it was unsafe.  In addition, the FDA warned Knoll that it should be "cautious" when marketing Meridia.

37.     FDA officials recommended that Meridia be listed under Schedule IV of the Controlled Substances Act.  Dr. Klein explained that the FDA was making this recommendation based on Meridia's large number of adverse effects which make it appear to be more like an amphetamine.  He also reminded Knoll that many patients dropped out of Meridia's studies because of amphetamine-like side-effects.

38.     Dr. Hayes agreed with these findings, and added that one study's results were "worrisome." Dr. Wright also agreed that all of the factors show that Meridia is like an amphetamine. He also said there were many "worrisome" things seen in the study results.

39.     Knoll inquired if it would ever be possible to have Meridia taken off the controlled substances list. FDA officials replied by stating that after 3 years of "good data," the FDA would consider taking Meridia off the controlled substances schedule. Knoll agreed to review data provided by HFD-510 before making a decision about withdrawing the application for approval of the 20 mg dose.

*SEPTEMBER 25, 1997 MEETING*

40.     At a September 25, 1997, meeting between the FDA and Knoll, FDA officials inquired about a Meridia study where 31 patients were given echocardiograms. The FDA was surprised that Knoll would have done echocardiograms during their studies since Knoll claimed that they did not know Meridia caused heart problems. Knoll replied by stating that the echocardiograms were not done to analyze Meridia's potentially dangerous side-effects, but were done "in an exploratory fashion in an attempt to recruit patients for a separate study."

41.     FDA officials informed Knoll that studies should be done concerning Meridia's effects on heart valves. FDA believed that Meridia had more effects on the heart than was disclosed in prior studies conducted by Knoll. Knoll suggested that the problem of valvulopathy is unique to the drugs fenfluramine and dexfenfluramine only. FDA replied to this assertion by saying that Knoll was "assuming too much at this time."

*NOVEMBER 18, 1997 MEMORANDUM BY FDA DIRECTOR OF THE DIVISION OF*
*METABOLIC AND ENDOCRINE DRUG PRODUCTS, SOLOMON SOBEL, M.D.*

42.     In his November 18, 1997 memorandum, Dr. Sobel reported that the FDA could not proceed to a full approval of Meridia at that time. He recommended that Knoll make certain

changes before receiving full approval to market Meridia.  One of his suggestions was that greater emphasis be placed on hypertension information in the Patient Package Insert ("PPI") He also recommended that information about hypertension be placed at the beginning of the PPI.

43.    Dr. Sobel further stated that the NDA for Meridia was approvable.  However, it would not receive approval until Knoll made all the requested changes.

### FDA APPROVES MERIDIA DESPITE ITS CONCERNS

44.    On November 22, 1997, despite the dangers and concerns of the FDA officials, Knoll and BASF received approval from the FDA to market Meridia in the United States at dosages of 5 mg, 10 mg, and 15 mg.  Meridia was approved for use "in the management of obesity, including weight loss and maintenance of weight loss, and should be used in conjunction with a reduced calorie diet."

45.    Meridia was on pharmacy shelves in February 1998.

### DEFENDANTS MARKET MERIDIA WORLDWIDE

46.    On January 8, 1998, Knoll AG and Eisai announced a license agreement for the joint development and marketing of Meridia in Japan.

47.    On January 18, 1999, BASF Pharma's Reductil (active ingredient sibutramine) was granted marketing authorization by the German regulatory agency for the management of obesity.

48.    In April, 2001, Italy approved the marketing of sibutramine-based drugs.  They were sold under the trade names Reductil (Abbott), Ectiva (Bracco) and Reduxade (GlaxoSmithKlein).

49.     A sibutramine-based drug by the name of Reductil is marketed in England.

50.     Defendants sold Meridia in 70 countries worldwide.

### ACTIONS CONCERNING MERIDIA POST-MARKET APPROVAL
### FDA TELLS KNOLL TO CHANGE ITS MISLEADING ADVERTISING

51.     On October 22, 1998, as part of its routine monitoring program, the Division of Drug Marketing, Advertising, and Communications ("DDMAC") became aware of Meridia promotional materials that violated the Federal Food, Drug and Cosmetic Act and its regulations. Jayne E. Peterson, R.Ph., J.D., Regulatory Review Officer for the DDMAC, found that a direct-to-consumer 60-second television advertisement was in violation of FDA regulations.

52.     Peterson's findings were directed to Robert W. Ashworth, Director of Regulatory Affairs for Knoll Pharmaceutical Company.  Her report indicated that the television advertisement was "lacking in fair balance" because it:

> Failed to present information relating to side-effects and contraindications with a prominence reasonably comparable with the presentation of information to the effectiveness of the drug.  The risk information is presented in the audio portion of the advertisement against a visual background of busy activity and five scene changes. These visuals interfere with the audience's
> ability to comprehend and process the audio presentation disclosing Meridia's  most important risks.  In addition, the audio communication of the risk information is inadequate because it is not presented with a prominence, speed, or audibility reasonably compared with the presentation of the product's benefits.

53.     Furthermore, the FDA found one of the ad's statement "It's a controlled substance so some patients may experience limited dependence" was misleading because it did "not adequately convey to consumers the potential risks associated with the use of  Meridia as related to its designation as a controlled substance."

54.     The FDA further found that the advertisement was misleading in that it:

does not adequately communicate Meridia's indication from its approved product labeling. The audio presentation of the statement, "If you're significantly overweight," combined with the "Super" (visual only) presentation of the statement "At least 25-45 lbs. Overweight, depending on height" does not adequately convey the limitations to the population of patients indicated for treatment with Meridia. Specifically, the "super" does not present the indicated patient population description in a sufficiently prominent manner to enable the audience to comprehend and process this integral piece of Meridia's indication.

55.    As a result, the FDA ordered Knoll to immediately discontinue the use of the television advertisement and other promotional materials 'that contain the same or similar representations of Meridia." Knoll was also ordered to submit a written response to the DDMAC on or before November 2, 1998, confirming that they had discontinued using the materials.

### *FDA APPROVES SAFETY-RELATED DRUG LABELING CHANGES IN 1999*

56.    In 1999, a new subsection was added to Meridia's drug labeling information entitled Postmarketing Reports. This section was to include reports of adverse events associated with the use of Meridia. Among those events were:

Cardiovascular: angina pectoris, abnormal ECG, arrhythmia, atrial fibrillation, cerebrovascular
accident, chest pressure, chest tightness, congestive heart failure, heart arrest, heart rate decreased, hemorrhage, myocardial infarction, sudden unexplained death, superventricular tachycardia, Syncope, torsade de pointes, transient ischemic attack, ventricular extra systoles, ventricular fibrillation, ventricular tachycardia.

### *FDA APPROVES SAFETY RELATED DRUG LABELING CHANGES IN 2001*

57.    On February 16, 2001, David G. Orloff, M.D., Director, Division of Metabolic and Endocrine Drug Products, approved supplemental new drug applications submitted under section 505(b) of the Federal Food, Drug and Cosmetic Act for Meridia on April 17, 2000.

58.    The approval letter was directed to Robert J. Mandetta, Associate Director, Regulatory Affairs of Knoll Pharmaceutical Company.

59.    The supplemental new drug applications, as amended, provide for additional

paragraphs and a table to be added to the Clinical Studies section of Meridia's drug labeling. This new section was to include results of a 2-year clinical study of patients taking Meridia. Adverse cardiac events associated with Meridia use were highlighted in the table.

60.     The table showed a mean 4.0% increase in baseline systolic blood pressure and 5.0% mean increase in diastolic blood pressure in patients taking 15 mg of Meridia daily.  The placebo groups averaged a 0.1% DECREASE in systolic blood pressure and 0.1% increase in diastolic blood pressure.

*DEFENDANTS ADMIT RECEIVING*
*REPORTS OF DEATH ASSOCIATED WITH MERIDIA USE*

61.     Dr. Eugene Sun, the Vice-President for Pharmaceutical Development at Abbott has admitted that Abbott had received reports of 32 deaths in people who were taking sibutramine, with 28 in the United States, two in Italy, one in Switzerland, and one in South Africa.

62.     Between the period of November 22, 1997 and September 30, 2001, the FDA received the following reports regarding Meridia:  397 reports of people with serious adverse reactions, including 152 hospitalized patients and an additional 29 deaths (19 deaths from cardiovascular causes such as heart attacks).  Included in the 19 deaths were 10 people 50 years of age or younger, including three women under the age of 30.  Furthermore, 143 patients reported arrhythmia.

*FDA MONITORS REPORTS OF DEATH ASSOCIATED WITH MERIDIA*

63.     On March 15, 2002 the FDA announced that it was monitoring overseas reports of deaths and adverse events associated with the weight-loss drug sibutramine, the active ingredient found in Meridia.

64.     The FDA said that since sibutramine's US launch as Meridia in 1997, the agency has received a total of 5,000 adverse reaction reports, with 306 being cardiac events.  The total includes domestic and foreign reports.

65.     The agency has 25 reports of deaths, 16 due to a cardiac event, in people taking sibutramine.

*REPORTS LINK MERIDIA TO DEATHS AROUND THE GLOBE*

66.     Data obtained by Public Citizen, a nationwide consumer organization, show that from the time it was introduced in February 1998 to Sept. 30, 2001, there were almost 400 serious adverse reactions in patients taking Meridia. This included 19 cardiac deaths, including 10 in people under the age of 50, three of whom were women under 30.  The average yearly weight loss for patients taking a standard 10 mg dose was only six and a half pounds more than the loss in those taking a placebo.

67.     Since Meridia's 1997 launch in the United States, the FDA says it has received a total of 5,000 adverse reaction reports, with 306 being cardiac events.  The total includes domestic and foreign reports.  The agency's records include 25 reports of death in people taking sibutramine, 16 of which were due to cardiac events.

68.     Following two deaths and 50 reports of adverse events since its approval in 2001, the Italian Health Ministry has suspended the sale of weight-loss products containing sibutramine.  Italian authorities have subsequently asked Abbott to remove Reductil from the market.

69.     In the United Kingdom ["UK"] and France alone, there have been a rising number of serious adverse reaction reports in people using the drug including two deaths in Britain.  In addition to the two deaths, Britain reported that more than 200 patients taking sibutramine had

experienced  adverse reactions.  In early March, 2002, French authorities said they had received 99 reports of adverse events potentially related to the drug.

70.     The number of adverse events continues to increase and be reported.  Other national agencies have been examining the number of adverse drug reaction reports in preparation for a Europe-wide review by the European Medicines Evaluation Agency.

71.     The European Medicines Evaluation Agency met to determine what course of action to take with sibutramine.

72.     Britain's Department of Health told Reuters Health that "up to 13 March 2002, a total of 212 reports of suspected adverse reactions have been received via the Yellow Card Scheme in the UK in association with sibutramine.  Of these reports, 93 were considered serious, including 2 reports where the suspected adverse reaction had a fatal outcome."  The Department said that the Medicines Control Agency (MCA) and Committee on Safety of Medicines (CSM) are intensively monitoring the safety of sibutramine.

*MEDICAL JOURNALS ADVISE AGAINST THE CONTINUED USE OF MERIDIA*

73.     The Medical Letter on Drugs and Therapeutics, after a review of  Meridia, concluded that "Medical letter consultants advise against using the drug."

74.     Prescrire International, a French medical journal, stated that Meridia had "amphetamine-like side-effects" and "in practice [Meridia] currently has no place in the management of obesity."

16

*PLAINTIFF'S USE OF MERIDIA AND HER SUBSEQUENT INJURIES*

75.    On March 4, 1998, Plaintiff purchased the prescription drug Meridia, and began taking it for weight loss (beginning with 10mg, capsules, and increasing to 15 mg, on April 6, 1998), pursuant to the prescription and advice of her physician.

76.    Plaintiff continued taking the prescription drug until August 28, 1998.

77.    The prescription drug taken by Plaintiff had been compounded, distributed, marketed, and sold by defendants.

78.    As a direct and proximate result of the ingestion of Meridia, Plaintiff sustained the following serious injuries and damages:  on August 28, 1998, Plaintiff suffered from a condition later described as fluctuating hypertension, which caused blurred vision in the left eye and headache.  Plaintiff was diagnosed as having had central retinal vein occlusion of her left eye, with attendant loss of vision in her left eye, which has been permanent.

79.    As a result of the described injuries and damages, Plaintiff has endured pain and suffering, permanent vision loss in the left eye, and medical expenses.

## **TOLLING OF APPLICABLE STATUTES OF LIMITATION**

80.    Any applicable statutes of limitations have been tolled by the defendants' knowing and active concealment and denial of the facts as alleged herein.  Plaintiff has been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on her part.  Plaintiff could not reasonably have discovered the defective nature of Meridia prior to March 15, 2002.

81.     Defendants are and were under a continuing duty to disclose the true character, quality, and nature of Meridia to Plaintiff.  Because of their concealment of the true character, quality, and nature of Meridia, defendants are estopped from relying on any statute of limitations defense.

## NATURE OF THE CASE

82.     This action is one which includes claims against defendants for:  (1) strict products liability (failure to warn); (2) strict products liability (manufacturing defect/design defect); (3) negligence; (4) negligent manufacture; (5) negligence per se; (6) negligent misrepresentation; (7) breach of implied warranty; (8) breach of express warranty; (9) unjust enrichment; and, (10) deceptive acts and practices in violation of Chapter 93A, all arising from defendants' manufacture and sale of the diet drug, Meridia, and its effects upon Plaintiff.

## CLAIMS FOR RELIEF

### AS AND FOR PLAINTIFF'S FIRST CLAIM:
### STRICT PRODUCTS LIABILITY
### (FAILURE TO WARN)

83.     Plaintiff hereby incorporates by reference the factual allegations as contained in the preceding paragraphs, as if fully set forth herein, and further alleges as follows:

84.     Defendants are manufacturers and/or suppliers of Meridia

85.     The Meridia manufactured and/or supplied by defendants was not accompanied by proper warnings to physicians and the medical community regarding all possible adverse side effects associated with the use of Meridia and the comparative severity and duration of such adverse effects.

86.    The warnings and information given to the medical community did not accurately reflect the symptoms, scope, or severity of the potential side effects.

87.    Defendants failed to perform adequate testing in that adequate testing would have shown that Meridia possessed serious potential side effects with respect to which full and proper warnings accurately and fully reflecting symptoms, scope and severity should have been made.

88.    The Meridia manufactured and/or supplied by defendants was defective due to inadequate post-marketing warning or instruction because, after defendants knew or should have known of the risk of injury and death from Meridia, defendants failed to provide adequate warnings to physicians and the medical community who prescribed the drug to their patients who were the ultimate consumers of the product and despite their inadequate post-marketing warnings and instructions to physicians and the medical community, continued to aggressively promote the product.

89.    As a direct and legal result of the defective condition of Meridia as manufactured and/or supplied by defendants, and of the negligence, carelessness, other wrongdoing and actions of defendants described herein:

a.    Plaintiff suffered serious and grievous personal injuries and harm;

a.    Plaintiff suffered economic loss, including loss of earnings, and loss of earning capacity; and,

b.    Plaintiff was required to expend fair and reasonable expenses for necessary health care, attention, and services and did incur incidental and related expenses.

**AS AND FOR PLAINTIFF'S SECOND CLAIM:**
**STRICT PRODUCTS LIABILITY**
**(MANUFACTURING DEFECT/DESIGN DEFECT)**

90.     Plaintiff hereby incorporates by reference the factual allegations as contained in the preceding paragraphs, as if fully set forth herein, and further alleges as follows:

91.     Defendants are liable to Plaintiff pursuant to § 402A of the Restatement of Torts (3d) and state law.

92.     Defendants are manufacturers and/or suppliers of Meridia

93.     The Meridia manufactured and/or supplied by defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation.

94.     Alternatively, the Meridia manufactured and/or supplied by defendants was defective in design or formulation, in that, when it left the hands of the manufacturer and/or suppliers, it was unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other anti-obesity medication without concomitant accurate information and warnings accompanying the product for physicians and the medical community to rely upon in their treatment and administration to patients like Plaintiff.

95.     The Meridia manufactured and/or supplied by defendants was defective due to inadequate warning and/or inadequate clinical trials, testing, and study, and inadequate reporting regarding the results of the same.

96.     The Meridia manufactured and/or supplied by defendants was defective due to inadequate post-marketing warning or instruction because, after defendants knew or should have

known of the risk of injury from Meridia, defendants failed to provide adequate warnings to the medical community and specifically to physicians who prescribed the medications to their patients, the ultimate users or consumers of the product and despite this information and knowledge, failed to report these problems to the medical community and continued to promote the product as safe and effective.

97.     As the direct and legal result of the defective condition of Meridia as manufactured and/or supplied by defendants, and of the negligence, carelessness, other wrongdoing and actions of defendants described herein:

    a.     Plaintiff suffered serious and grievous personal injuries and harm;

    b.     Plaintiff suffered economic loss, including loss of earnings, and loss of earning capacity; and,

    c.     Plaintiff was required to expend fair and reasonable expenses for necessary health care, attention, and services and did incur incidental and related expenses.

## AS AND FOR PLAINTIFF'S THIRD CLAIM:
### NEGLIGENCE

98.     Plaintiff hereby incorporates by reference the factual allegations as contained in the preceding paragraphs, as if fully set forth herein, and further alleges as follows:

99.     Defendants are the manufacturers, sellers, and/or suppliers of the drug, Meridia.

100.     Meridia was not accompanied by appropriate warnings of the increased risk of adverse side effects caused by the ingestion of Meridia.  The warnings given by defendants did not accurately reflect the risks, incidence, symptoms, scope, or severity of the side effects.

101.    Defendants failed to perform adequate testing concerning the safety of the drug, Meridia, because adequate testing would have shown that Meridia posed and poses a serious risk of side effects, and would have permitted the defendants to provide adequate and appropriate warnings to prescribing physicians and the consuming public.

102.    Defendants had a duty to exercise reasonable care in the manufacture, sale, and/or distribution of the drug, Meridia, including the duty to assure that the product does not cause users to suffer from unreasonable, dangerous side effects.

103.    Defendants are negligent in the design, manufacture, testing, advertising, marketing, promoting, labeling, warnings given, and sale of Meridia in that they:

    a.    Failed to accompany the drug, Meridia, with proper warnings regarding all possible adverse side effects associated with its use;

    b.    Failed to conduct adequate pre-clinical and clinical testing and post-marketing surveillance to determine the safety of the drug, Meridia;

    c.    Failed to provide adequate training and instructions to medical care providers for appropriate use of the drug, Meridia;

    d.    Failed to warn Plaintiff prior to actually encouraging the sale of Meridia, either directly or indirectly through third parties or related entities, about the following:

        i.    The need for comprehensive, regular medical monitoring to ensure early discovery of the potential side effects caused by this drug;

        ii.    The possibility of becoming ill, suffering arrhythmia, increased heart rate, increased blood pressure damage, and in certain, extreme outcomes, death, as a result of use of the drug and/or having to undergo medical treatment in order to correct or control side effects;

iii.  Side effects may become protracted, debilitating, difficult, and painful, necessitating several visits to the doctor and/or hospitalization; and,

iv.  The need for regular medical monitoring that is different from the routine testing for patients seeking a weight loss program;

e.  Failed to warn that the risks associated with Meridia would exceed the risks of other comparable forms of treatment for obesity;

f.  Negligently marketed Meridia despite the fact that the risk of the drug was so high and the benefits of the drug were so speculative that no reasonable pharmaceutical company, exercising due care, would have done so;

g.  Recklessly, falsely, and deceptively represented, or knowingly omitted, suppressed, or concealed, material facts regarding the safety and efficacy of Meridia to or from the FDA and/or the FDA's advisory committee such that, had the FDA or its advisory committee members known of such facts, Meridia would never have been approved and no physician would have been able to prescribe the drug to Plaintiff;

h.  Remained silent, despite their knowledge of the growing public acceptance of their information and misrepresentations regarding the safety and efficacy of Meridia, and did so because the prospect of profits outweighed health and safety issues, all to the significant detriment of Plaintiff;

i.  Failed to comply with their post-manufacturing duty to warn which arose when they knew, or with reasonable care should have known, that their drug was being prescribed without warning of the true risks of side effects; and

j.  Were otherwise careless, negligent, grossly negligent, reckless, and acted with willful and wanton disregard for the rights of Plaintiff.

104.    Despite the fact that the defendants knew, or should have known, that Meridia caused unreasonable, dangerous side effects that many users would be unable to remedy by any means, defendants continued to market Meridia to consumers, including Plaintiff, when there were safer alternative methods and treatments.

105.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injuries as a result of defendants' failure to exercise ordinary care, as described above.

106.    Defendants' actions constitute knowing omission, suppression, and/or concealment of material facts, made with the intent that others rely upon such omissions, suppressions, and/or concealments in connection with the marketing of Meridia.

107.    Defendants' negligence was the proximate cause of the increased risk of harm suffered by the Plaintiff.

108.    The conduct of defendants demonstrates that they acted unlawfully and negligently; used or employed unconscionable commercial and business practices; engaged in deception, fraud, false pretense, false promises or misrepresentations; and/or perpetrated knowing concealment, suppression or omission of material facts, with the intent that consumers, including Plaintiff, rely upon such concealment, suppression, and/or omission, in connection with the sale or advertisement of Meridia.

109.    As a direct and proximate cause of defendants' negligent breach of their duty, Plaintiff ingested Meridia, and:

      a.    Plaintiff suffered serious and grievous personal injuries and harm;

      b.    Plaintiff suffered economic loss, including loss of earnings, and loss of earning capacity; and,

24

c.    Plaintiff was required to expend fair and reasonable expenses for necessary health care, attention, and services and did incur incidental and related expenses.

## AS AND FOR PLAINTIFF'S FOURTH CLAIM: NEGLIGENT MANUFACTURE

110.    Plaintiff hereby incorporates by reference the factual allegations as contained in the preceding paragraphs, as if fully set forth herein, and further alleges as follows:

111.    Defendants are the manufacturers, sellers, and/or suppliers of the drug, Meridia.

112.    Defendants knew or reasonably should have known that the Meridia manufactured and/or supplied by defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation.

113.    Alternatively, defendants knew or should have known that Meridia was defective in design or formulation, in that, when it left the hands of the manufacturer and/or suppliers, it was unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other anti-obesity medications without concomitant accurate information and warnings accompanying the product for physicians and the medical community to rely upon in their treatment and administration to patients like Plaintiff.

114.    Defendants knew or should have known that Meridia was defective due to inadequate warning and/or inadequate clinical trials, testing, and study, and inadequate reporting regarding the results of the same.

115.    Defendants knew or should have known that Meridia was defective due to inadequate post-marketing warning or instruction because, after defendants knew or should have known of the risk of injury or death from Meridia, defendants failed to provide adequate warnings to the medical community and specifically to physicians who prescribe the medications to their patients, the ultimate users or consumers of the product and despite this information and knowledge, failed to report these problems to the medical community and continued to promote the product as safe and effective.

116.    As a direct and proximate result of defendants' negligence in the manufacture of Meridia:

Plaintiff suffered serious and grievous personal injuries and harm;

a.    Plaintiff suffered economic loss, including loss of earnings, and loss of earning capacity; and,

b.    Plaintiff was required to expend fair and reasonable expenses for necessary health care, attention, and services and did incur incidental and related expenses.

**AS AND FOR PLAINTIFF'S FIFTH CLAIM:**
**NEGLIGENCE PER SE**

117.    Plaintiff hereby incorporates by reference the factual allegations as contained in the preceding paragraphs, as if fully set forth herein, and further alleges as follows:

118.    At all times herein mentioned, defendants had an obligation not to violate the law, in the manufacture, design, formulation, compounding, testing, production, processing, assembly, inspection, research, distribution, marketing, labeling, packaging, preparation for use, sale, and warning of the risks and dangers of Meridia.

119.     At all times herein mentioned, defendants violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq., related amendments and federal regulations promulgated pursuant thereto, and other applicable laws, statutes, and regulations.

120.     Plaintiff, as purchaser and consumer of Meridia, is within the class of persons the statutes and regulations described above are designed to protect, and Plaintiff's injuries are the type of harm these statutes are designed to prevent.

121.     Defendants' acts constitute an adulteration and/or misbranding as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331, and constitute a breach of duty subjecting defendants to civil liability for all damages arising therefrom, under theories of negligence per se.

122.     Defendants failed to meet the standard of care set by the following regulations, which were intended for the benefit of individuals such as Plaintiff, making defendants negligent, per se:

a.     The labeling lacked adequate information on the use of Meridia [21 CFR § 201.56(a) and (d)];

b.     There was inadequate information for patients for the safe and effective use of Meridia [21 CFR § 201.57(f)(2)];

c.     There was inadequate information regarding special care to be exercised by the doctor for the safe and effective use of Meridia [21 CFR § 201.57(f)(1)]; and,

d.     The labeling was misleading and promotional [21 CFR § 201.56(b)].

123.     As a result of the violations of the statutes described above:

a.     Plaintiff suffered serious and grievous personal injuries and harm;

    b.    Plaintiff suffered economic loss, including loss of earnings, and loss of earning capacity; and,

    c.    Plaintiff was required to expend fair and reasonable expenses for necessary health care, attention, and services and did incur incidental and related expenses.

### AS AND FOR PLAINTIFF'S SIXTH CLAIM:
### NEGLIGENT MISREPRESENTATION

124.　Plaintiff hereby incorporates by reference the factual allegations as contained in the preceding paragraphs, as if fully set forth herein, and further alleges as follows:

125.　From the time that Meridia was first manufactured, defendants marketed and distributed, and made false representations, as previously set forth herein, to Plaintiff, her physicians and the general public, including but not limited to the misrepresentation that Meridia was safe, fit for effective human consumption.  At all times herein mentioned, defendants conducted a sales and marketing campaign to promote the sale of Meridia and willfully deceived Plaintiff, the medical community and the general public as to the health risks and consequences of the use of Meridia.

126.　Defendants made the foregoing representations without any reasonable grounds for believing them to be true.  These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of Meridia.

127.　The foregoing representations by defendants were in fact false, in that Meridia was not safe, fit and effective for human consumption.  The use of Meridia is hazardous to

health.  Meridia has a serious propensity to cause serious injuries or death to users, including but not limited to the injuries suffered by Plaintiff as delineated herein.

128.    The foregoing representations by Defendants were made with the intention of inducing reliance and the prescription, purchase and use of Meridia.

129.    In reliance on the misrepresentations by Defendants, Plaintiff's physicians were induced to prescribe Meridia and Plaintiff was induced to buy Meridia.  If Plaintiff and Plaintiff's physicians had known of the true facts and the facts concealed by the Defendants, Plaintiff would not have used Meridia.  The reliance of Plaintiff and Plaintiff's physicians upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities who were in a position to know the true facts.

130.    As a result of the foregoing negligent misrepresentations by Defendants:

    a.    Plaintiff suffered serious and grievous personal injuries and harm or death;

    b.    Plaintiff suffered economic loss, including loss of earnings and loss of earning capacity; and

    c.    Plaintiff was required to expend fair and reasonable expenses for necessary health care, attention and services and did incur incidental and related expenses.

**AS AND FOR PLAINTIFF'S SEVENTH CLAIM**
**BREACH OF IMPLIED WARRANTY**

131.    Plaintiff hereby incorporates by reference the factual allegations as contained in the preceding paragraphs, as if fully set forth herein, and further alleges as follows:

132.    At the time Defendants marketed, sold, and distributed the drug, Meridia, for use by Plaintiff, Defendants knew of the use for which Meridia was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

133.    Plaintiff, and Plaintiff's physicians, reasonably relied upon the skill and judgment of Defendants as to whether Meridia was of merchantable quality and safe and fit for its intended use.

134.    Defendants breached the implied warranty of merchantability because Meridia was not of merchantable quality, and was not safe or fit for its intended use because the product was and is reasonably dangerous and unfit for the ordinary purpose for which it was intended.

135.    As a direct and proximate result of the Defendants' breach of the implied warranty of merchantability, Plaintiff suffered an increased risk of harm, and is entitled to the damages specified.

## AS AND FOR PLAINTIFF'S EIGHTH CLAIM
## BREACH OF EXPRESS WARRANTY

136.    Plaintiff hereby incorporates by reference the factual allegations as contained in the preceding paragraphs, as if fully set forth herein, and further alleges as follows:

137.    Defendants expressly warranted that Meridia was safe and well-tolerated by patients studied.

138.    Plaintiff purchased Meridia for the purpose of ingesting it and obtaining health benefits therefrom.

139.    Plaintiff and Plaintiff's physicians reasonably relied upon the skill and judgment of Defendants as to whether Meridia was of merchantable quality and safe and fit for its intended use.

140.    Meridia did not conform to Defendants' express representations because Meridia is not safe and has high levels of serious side effects, including life-threatening side effects.

141.    As a direct and proximate result of the breach of said warranties, Plaintiff was caused to suffer injuries, harm, and economic loss.

142.    Defendants acted fraudulently, recklessly, intentionally, and maliciously and/or with reckless disregard for the rights and safety of Plaintiff.

143.    As the direct and legal result of the defective condition of Meridia as manufactured and/or supplied by Defendants, and of the breach of said warranties, and other wrongdoing of Defendants described herein:

      a.    Plaintiff suffered serious and grievous personal injuries and harm or death;

      b.    Plaintiff suffered economic loss, including loss of earnings and loss of earning capacity; and

      c.    Plaintiff was required to expend fair and reasonable expenses for necessary health care, attention and services and did incur incidental and related expenses.

## AS AND FOR PLAINTIFF'S NINTH CLAIM
## UNJUST ENRICHMENT

144.    Plaintiff hereby incorporates by reference the factual allegations as contained in the preceding paragraphs, as if fully set forth herein, and further alleges as follows:

31

145.    Defendants are the manufacturers, sellers, and/or suppliers of the drug, Meridia.

146.    Plaintiff paid for Meridia for the purpose of managing obesity.

147.    Defendants have accepted payment by Plaintiff for the purchase of Meridia.

148.    Plaintiff did not receive a safe and effective weight loss and management drug for which she paid.

149.    It would be inequitable for the Defendants to keep this money if the Plaintiff did not in fact receive a safe and efficacious weight loss and management drug.

**AS AND FOR PLAINTIFF'S TENTH CLAIM:
DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF CHAPTER 93A**

150.    Plaintiff hereby incorporates by reference the factual allegations as contained in the preceding paragraphs, as if fully set forth herein, and further alleges as follows:

151.    Defendants knew or should have known that their drug, Meridia, was dangerous and unsafe for its intended use.  Nonetheless, defendants continued to manufacture, market, and sell the dangerous and unsafe drug within the Commonwealth, and in fact, sold it to Plaintiff.

152.    The actions of defendants constitute unfair and deceptive acts and practices within the meaning of Massachusetts General Laws Chapter 93A, §§ 2 and 9.

153.    Plaintiff, through her attorney, has delivered to the defendants by certified mail, return receipt requested, postage prepaid, a written demand for relief pursuant to Massachusetts General Laws Chapter 93A, § 9, identifying the claimant and reasonably describing the unfair acts and practices relied upon and the injuries suffered.  The Plaintiff has received no reasonable offer of relief by defendants.

154.    The actions of the defendants as described herein were performed willfully and knowingly.

155.    As a result of these unfair and deceptive acts and practices, Plaintiff has been injured as described in further detail, *supra*.

## JURY DEMAND

156.    Plaintiff demands a trial by jury of all issues which are triable as of right.

**WHEREFORE**, the Plaintiff, PAULA LEATHERS, respectfully prays that the Court award the following remedies:

a.    Order defendants to compensate Plaintiff for the injuries she sustained as a result of defendants' negligence, product liability, breach of warranty, and deceptive acts and practices;

b.    Order compensatory damages to be paid to Plaintiff, in an amount to be determined, for her pain and suffering;

c.    Order punitive damages (including treble damages as provided by Massachusetts General Laws Chapter 93A, § 9(3)) to be paid to Plaintiff, in an amount to be determined.

d.    Order defendant to pay Plaintiff's reasonable costs, interest, and attorney's fees for bringing this action; and,

e.    Order such further and additional relief as is deemed just and equitable in the circumstances.

Dated:    Haverhill, MA
         June 24, 2005

                                      PLAINTIFF
                                      By her attorney,

                                      LAW OFFICE OF
                                      STEPHEN L. RAYMOND, ESQ.

By:    */s/ Stephen L. Raymond*
            Stephen L. Raymond
            3 Washington Square, Ste. 206
            Haverhill, MA  01830
            (978) 372-6590
            BBO #567753